UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA                  :
                                          :   HON. JED S. RAKOFF
                                          :
    -against-                             :   DEFENDANT'S AFFIDAVIT
                                          :
MONZER AL KASSAR,                         :   07 CR. 354 (JSR)
TAREQ MOUSA AL GHAZI, and                 :
LUIS FELIPE MORENO GODOY                  :
                                          :
              Defendants                  :
------------------------------------------------------------x

### AFFIDAVIT OF DEFENDANT TAREQ MOUSA AL GHAZI

STATE OF NEW YORK    )
COUNTY OF NEW YORK ) ss.

I, Tareq Mousa al Ghazi, being duly sworn, and under penalty of perjury, depose and state that the following is true and accurate to the best of my knowledge:

1. As of the Summer 2005, I lived in a town in southern Lebanon with my wife, Amal, who worked as a doctor, and my two children. I lived in a modest home and our life was simple and relatively inexpensive. As a doctor, my wife made a salary, which I supplemented by selling religious trinkets in the street. I also received a pension from the Palestinian National Authority.

2. I was living a completely law-abiding life and was involved in absolutely no illegal activity of any type. I never broke any American law and never agreed or planned to break one. Additionally, I had no connection to the United States before being brought here by the U.S. government after my arrest in Romania on these charges.

3. In or about June 2005, a man came to my home that I had never seen before. The man introduced himself as Samir N.H. I know his full name but will refer to him as Samir, which is how I addressed him. Samir said he had been looking for me and that he had been to Ein el-Hilweh, which is a large Palestinian Refugee Camp in Lebanon. He said that he got my address from someone at the camp. He also said that he had gone to the home of my brother in an effort to locate me.

4. I invited Samir into my home. He was well-dressed and was smoking an expensive cigar. He appeared to be a successful businessman of some type. Immediately, Samir tried to convince me that he and I had things in common. For instance, he wanted me to think that he and I knew some of the same people in the Palestinian Liberation Organization (PLO), with which I was affiliated over 20 years ago. Samir claimed he was in the PLO himself. Often, as I would tell him about some of my experiences, he would reply by saying "oh, I know," suggesting that he was already familiar with aspects of my life. Looking back at our first meeting, I believe Samir was trying to get me to trust him and to view him as a friend by convincing me that we had things in common. In fact, Samir said that he and I had to build trust before we started conducting any type of business activity.

5. During the next several meetings, each of which took place in restaurants in southern Lebanon, Samir did not mention exactly what sort of business he conducted. He did mention that he maintained two business offices – one in Athens, Greece and a second in Sofia, Bulgaria. But, when I

asked him about his business, he was generally vague and said only that he imported and exported different items.

6. I said to Samir several times that I was honored that he wanted to do business with me, and I was interested in a business relationship with him, but I insisted that any business venture we had must be completely legal. He assured me repeatedly that any business he and I conducted would be legal in all respects.

7. Part of the reason I repeatedly sought assurance from Samir that our business be legal is because Samir told me stories of illegal things he had done in the past. For instance, Samir said that in the past, he had dealt illegal drugs and assured me that dealing drugs was a good way to become rich. He also said that he had laundered money through a bank in Saudi Arabia and he showed me a $20,000,000 check that he said was related to that money laundering scheme. He also asked me if I had a bank account that Hamas could use to move funds. He also said that he had a business in Albania in which he smuggled people into Europe. Every time he brought up one of these criminal ideas, I told him emphatically that I was not interested in engaging in an illegal business. When I told him I wasn't interested in a particular illegal business that he proposed, he would stop discussing that type of illegal activity, and our conversation would move on to something else. I told him, in substance, that there were many legal businesses through which money could be made, and that he did not have to resort to illegal activity.

8. At about the fourth or fifth meeting, Samir for the first time proposed a business venture, and assured me it was legal. Samir said that he had a client who was connected with the government of the Ivory Coast who wanted to buy about 1,000 rifles. Samir asked for my assistance in acquiring these rifles. I explained to him that the law requires the client to secure a legitimate end-user certificate issued by the government of the country buying the firearms. It was, and is, my understanding (and I explained this to Samir) that selling rifles and many other types of firearms is completely legal if the buyer has the necessary certificate showing that these precise firearms are being ordered by a certain country that has the legal right to buy them. Moreover, the end user certificate must then be presented to the factory filling the order, and the factory is allowed to produce only those exact items contained on the end user certificate. Additionally, the person acting as the broker, as Samir would be in this case, may possess and transfer only those items listed on the end user certificate. If those requirements are followed, firearms may be lawfully sold, transported and possessed. I explained all of this to Samir. He said he understood and would follow the legal requirements I set out for him.

9. In addition to the requirement of an end user certificate, I explained that sometimes the United Nations makes selling certain items, such as firearms, to certain countries illegal at various times. In regard to Samir's proposed deal, I explained that I believed that Samir could not legally sell

firearms to the Ivory Coast at that time because there was a United Nations embargo on weapons going to the Ivory Coast.

10. When I explained to Samir that the U.N. prevented the legal sale of firearms to the Ivory Coast, Samir started to change the business proposal. Under the revised proposal, he said that he had two clients who were with, and were acting on behalf of, the Nicaraguan Government. Samir said these clients were prepared to present us with a legitimate end user certificate from the country of Nicaragua for the purchase of firearms. As before, Samir represented to me that the deal was to be completely legitimate and legal.

11. At a certain point, Samir said, in substance, that his clients wanted Monzer al-Kassar to be involved in the arms deal. I was opposed to Kassar's involvement and I told Samir this several times. I told Samir that his clients' order was not large and that I could fill it without the help of Kassar or anyone else. However, Samir insisted that Kassar be included in the deal. He said, in substance, that unless Kassar was involved, his clients did not want to go through with the transaction, and that he and I would lose out on our commissions, and he would look bad in front of his clients. Samir continued to pressure me to the point that against my will, I reluctantly brought Kassar into Samir's weapons transaction. I did this solely because this is what Samir demanded and for no other reason.

12. After Samir and Kassar met in December 2006, Samir told me that I had to accompany him (Samir) to Spain for further discussions or else I would

5

lose my commission. Without my asking, Samir bought my plane ticket to Spain and told me that on a certain date he and I were flying to Spain to meet with Kassar. In fact, it was Samir who told Kassar that he was bringing me to the meeting. This was the first of several flights Samir would pay for. Samir paid for each of my flights to and from Spain as well as my travel to Romania where I was arrested. I am advised by my lawyer that the Government alleges that I traveled to these places "on behalf of" Kassar; this is simply false. I traveled to these places because this is what Samir told me I had to do, and Samir paid for the flights.

13. I maintain my position that I am innocent of these charges. I never intended to commit a crime against the United States or any other country, and certainly had no idea that the weapons deal between Kassar and Samir, Carlos and Luis that was planned in Spain was a violation of United States law. In fact, when I was first told after my arrest that I was being held in custody at the urging of the United States, I did not believe the information. I couldn't fathom what I had done against the United States, and I still can't.

14. My lawyer has explained to me that the purpose of this affidavit is to provide the Court with sworn facts to substantiate my request for a pre-trial hearing on the issue of whether the Government's investigation and prosecution of me violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution. My lawyer has explained at length what these principles mean and how they relate to my case. My lawyer

also said that this affidavit does not have to contain every fact known to me nor does it have to contain every conversation I had with Samir or anyone else. After all, my dealings with Samir took place over the course of almost two years and it would be impractical to set forth every meeting, every phone conversation and every subject he and I discussed. So, there are many other facts that I know about these matters that I have not set forth in this affidavit, and this is by design, not omission.

15. My lawyer has read the affidavit to me sentence by sentence through an interpreter named Marwan Abdel Rahman, and I fully understand what it says, and I restate my assertion that it is completely truthful.

Dated: New York, New York
       June 10, 2008

Interpreted to me from English into Arabic
By Marwan Abdel Rahman

I swear that the above affidavit is true in all respects. I understand that by making false statements in an affidavit of this type that I may be prosecuted for federal offenses related to making false statements under oath or in connection with a court or official proceeding.

_____
Tareq Mousa al-Ghazi