# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :      **AFFIDAVIT IN SUPPORT OF**
                                         **REQUEST FOR EXTRADITION**
          -v.-                    :
                                         S3 07 Cr. 354 (JSR)
MONZER AL KASSAR,                 :
          a/k/a "Al Munawar,"
          a/k/a "El Taous,"       :
TAREQ MOUSA AL GHAZI, and
LUIS FELIPE MORENO GODOY,         :

               Defendants.        :

- - - - - - - - - - - - - - x

     I, LESLIE C. BROWN, being duly sworn, hereby depose and
state:

                    **INTRODUCTION**

     1.   I am a citizen of the United States.

     2.   From August 1999 until the present, I have been
employed by the United States Department of Justice as an
Assistant United States Attorney for the Southern District of New
York.  My duties, among others, are to prosecute persons charged
with criminal violations of the laws of the United States.
During my practice as an Assistant United States Attorney, I have
become knowledgeable about the criminal laws and procedures of
the United States.

     3.   As an Assistant United States Attorney for the Southern
District of New York, I am responsible for the preparation and
prosecution of criminal cases.  In the course of my duties, I

have become familiar with the charges and the evidence in the

case of <u>United States</u> v. <u>Monzer al Kassar, Tareq Mousa al Ghazi,</u>

<u>and Luis Felipe Moreno Godoy</u>.  I submit this affirmation in

response to a request from the Honorable Juan Del Olmo for

information regarding the origin and timing of the instant

investigation and the sequence and substance of the contacts

between the confidential sources and the defendants.  This

affidavit also describes United States law on the permissibility

of the use of confidential sources as part of a criminal

investigation.  This affirmation does not constitute the United

States' formal request to the Government of Spain for the

extradition of Monzer al Kassar ("AL KASSAR") (the "defendant")

to the Southern District of New York for prosecution; the formal

request will be submitted within the time prescribed by the First

Supplemental Treaty on Extradition between the United States and

Spain.

**OVERVIEW OF THE EVIDENCE**

4.    Between February 2007 and June 2007, AL KASSAR, and his

co-defendants AL GHAZI and MORENO,[1] agreed to sell millions of

dollars worth of weapons -- including machine guns, rocket-

---

[1] AL GHAZI and MORENO were arrested in Romania on the charges in
the Indictment and are pending extradition to the United States
from that country.

2

propelled grenade launchers, and surface-to-air missile systems -- to the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), a U.S.-designated foreign terrorist organization based in Colombia.  During a series of judicially authorized recorded telephone calls, emails, and in-person meetings -- a number of which were recorded on videotape and audiotape -- AL KASSAR, AL GHAZI, and MORENO agreed to sell the weapons to two confidential sources working with the Drug Enforcement Administration ("DEA"), who represented themselves as working for the FARC, with the specific understanding that the weapons were to be used to attack U.S. interests and kill U.S. nationals and military officers in Colombia.

5.  In furtherance of this agreement, AL KASSAR took a number of affirmative steps including, but not limited to: (1) giving the confidential sources (i) a photograph of the vessel to be used to transport the weapons, (ii) written specifications for the surface-to-air missiles he agreed to sell, and (iii) information on three bank accounts held in fictitious names that he controlled in Spain and Lebanon and into which payment was to be made; (2) offering to provide expert trainers from Lebanon to train members of the FARC how to effectively use his C4 explosives against U.S. interests and nationals in Colombia; (3) arranging for his associates to transport the weapons for the

3

FARC from Romania to Suriname; and (4) using his contacts at a weapons manufacturer in Romania to facilitate the transaction.

### BACKGROUND

6.    The instant investigation of AL KASSAR, which was conducted by the Drug Enforcement Administration ("DEA"), began in or about the Fall of 2003.  AL KASSAR was the subject of an arms trafficking investigation.  He is believed to have sold weapons and military equipment to armed factions engaged in violent conflicts around the world.  Some of those factions included designated foreign terrorist organizations.

### AL KASSAR's Prior Arms Dealing In Poland

7.    Prior to the investigation, the DEA had learned of AL KASSAR's predisposition to engage in criminal activity from multiple sources.[2]  Among those sources was a witness ("W-1")

---

[2]Under well-established United States caselaw, AL KASSAR will be able to challenge at trial the Government's use of confidential sources as part of the instant investigation by arguing that he had no previous intent to commit a crime and was unlawfully induced to do so by government agents.  Such a challenge is referred to as the "entrapment defense."  *See generally, Matthews* v. *United States*, 485 U.S. 58, 63 (1988).  This defense is defeated if the Government proves AL KASSAR was predisposed to commit the charged criminal conduct in any one of three ways: (1) an existing course of criminal conduct similar to the charged crime; (2) an already-formed design on the part of the defendant to commit the charged crime; or (3) a willingness to commit the crime with which the defendant is charged as evidenced by his ready response to the government inducement.  *See United States* v. *Salerno*, 66 F.3d 544, 547 (2d Cir. 1995); *United States* v. *Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980);

4

who, in or about the early 1990's, provided information regarding some of AL KASSAR's prior criminal history. · W-1, whose information has been corroborated by other evidence and deemed reliable, advised that he met AL GHAZI in the early 1980's in Poland.  According to W-1, Poland then was used as a safe haven by arms traffickers.  AL GHAZI introduced W-1 to AL KASSAR and Abu Abbas, then the leader of the Palestine Liberation Front ("PLF"), another U.S.-designated foreign terrorist organization.

8.    From in or about 1982 up to and including in or about 1986, W-1 assisted AL KASSAR and AL GHAZI, among others, to facilitate more than one hundred weapons transactions.  W-1 advised that those weapons were manufactured and smuggled from Poland, Hungary and the former Czechoslovakia to Yemen.  According to W-1, those weapons, once in Yemen, were distributed to the PLF and other organizations that had stated an intent to use them to target United States and Israeli interests.  Through

---

*United States* v. *Viviano* 437 F.2d 295, 299 (2d Cir. 1971). Simply stated, predisposition focuses on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.  *Matthews* v. *United States*, 485 U.S. at 62-63.  Under United States law, artifice, deception and strategy may be used to catch those engaged in criminal enterprises.  *See Jacobson* v. *United States*, 503 U.S. 540, 548 (1992); *United States* v. *Russell*, 411 U.S. 423, 434 (1973).  Based upon the facts contained within this affidavit, there can be no doubt that AL KASSAR was predisposed to commit the criminal activity with which he is charged.

W-1 the DEA learned that many of these weapons initially were procured with documentation that was legitimate on its face but which did not reflect the ultimate user of those weapons. In other words, the documentation involved in AL KASSAR's prior weapons transactions with W-1 did not provide that the weapons would be diverted to terrorist organizations and other criminal enterprises.

9.    In addition, W-1 stated that in or about 1992, AL GHAZI lived in a particular apartment in Poland at which W-1 often saw AL GHAZI and AL KASSAR. According to W-1, AL KASSAR used this apartment as a safe house to store documents related to his many weapons transactions, and sometimes weapons themselves.

10.    At that time, W-1 and another witness ("W-2"), whose information also has been corroborated by the DEA and deemed reliable, took a number of AL KASSAR's documents from AL GHAZI'S apartment in Poland and gave them to law enforcement officials. Those documents confirmed AL KASSAR's history as an arms dealer and connected him to Abu Abbas and the PLF.[3] Among those

_____

[3]Abu Abbas was the general director of the PLF and the mastermind of the hijacking of the vessel *Achille Lauro*. During proceedings related to AL KASSAR's trial in Spain on charges stemming from the hijacking of the *Achille Lauro*, AL KASSAR admitted in a sworn statement to his relationship with Abu Abbas and the PLF. The DEA also has obtained numerous photographs of AL KASSAR with Abu Abbas and other prominent members of the PLF.

documents were receipts for the sale of a large quantity of weapons to Yemen.[4]  These receipts reflected AL KASSAR's involvement in both the weapons transaction and his agreement to divert a percentage of those weapons to the PLF.  Specifically, the documents included a list of the weapons AL KASSAR had agreed to provide to the PLF and a code used to describe those weapons.  For example, the code list defined a "hand grenade" as a "ring;" a "SCUD missile" as "sanitary equipment;" and "TNT" as "air conditioners."  Among the weapons AL KASSAR agreed to provide as part of that particular transaction were "1,000 fragmentation rockets for MIROL launchers;" "10,000 anti-armored vehicle grenades with propulsion ignition devices;" and "two tons of high performance C-4 hydrogen plastic explosives."[5]

---

[4]U.S. law enforcement officials did not find it surprising that documents demonstrating the fact that AL KASSAR was an arms dealer were found in the early 1990's at an AL KASSAR-related location was unsurprising.  In October 1991, AL KASSAR negotiated a $1.5 million check from Adnan Khashoggi, a well-known arms dealer.

[5]These documents were admitted into evidence at AL KASSAR's trial in Spain related to the *Achille Lauro* hijacking.  While the Spanish court did not question the authenticity of the documents, it noted that there were questions regarding the manner in which these documents were obtained.  AL GHAZI has since boasted to a witness (who is identified later in this affidavit as W-5) about his success in convincing the Spanish authorities that these documents were taken from his apartment without his consent in his effort to undermine the authenticity of those documents and to "save AL KASSAR."  Implicit in this statement by AL GHAZI is that AL GHAZI, indeed, admitted to W-5 that the documents were AL

7

**AL KASSAR's Weapons Transactions With The Iraqi Insurgency**

11.   In or about 2002 and 2003, a witness ("W-3"), who then had contact with AL KASSAR, shared the information he learned about AL KASSAR with the DEA.  According to W-3, immediately prior to the United States invasion of Iraq in 2003, and while Iraq was precluded from receiving weapons and other military equipment, AL KASSAR sold night vision goggles to the Iraqi military and provided other assistance to the family of Saddam Hussain.  W-3 was aware that to conceal the nature of this transaction, AL KASSAR set up a front company to make the transaction appear to relate to a sale of trucks, commercial buses and clothing materials, rather than military equipment.  Indeed, at the time of the transaction, W-3 saw AL KASSAR in possession of night vision goggles.  W-3 understood from AL KASSAR that those night-vision goggles were part of sample AL KASSAR intended to sell to the Iraqi military.  W-3 understood from AL KASSAR that only a sample would be provided until Uday Hussain, one of Saddam Hussain's sons, paid for the entire shipment.  AL KASSAR told W-3 that Uday Hussain had agreed to pay €12,000,000 for the shipment.

─────────────────────

KASSAR's.

12.  W-3 also was aware that in addition to the contract to sell night vision goggles, AL KASSAR also had agreed to sell bullet proof vests and other military supplies, in exchange for several million Euros, to the Iraqi military.  According to W-3, AL KASSAR similarly concealed the nature of this transaction by forging the underlying paperwork so that the shipments appeared to contain additional trucks, commercial buses and clothing materials for an Iraqi business.  In August 2002, W-3 learned from one of AL KASSAR's co-conspirators that the transactions had been completed and payment made.  The equipment sold by AL KASSAR to the Iraqi military was provided within months of military action against Iraq by a coalition of forces which included troops from the United States, Spain and other countries.

13.  W-3 also provided information regarding AL KASSAR's efforts to launder money on behalf of Saddam Hussain.  In the summer of 2002, W-3 learned that AL KASSAR was seeking assistance to help move Saddam Hussain's money from Iraq to Lebanon.  To that end, AL KASSAR's contacts with a Lebanese bank agreed to and did launder approximately $30,000,000 on behalf of Saddam Hussain.  According to W-3, AL KASSAR and his co-conspirators later used a private plane to fly an additional $1 billion from Iraq to Lebanon.

## AL KASSAR's Prior Assistance To The PLF

14.   The DEA also was aware of AL KASSAR's predisposition to provide assistance to terrorist organizations and sell weapons through a court-authorized wiretap in or about late 2004 on the telephone of an AL KASSAR associate in Sweden.  Those judicially authorized intercepts, which included a number of conversations in which AL KASSAR participated, revealed AL KASSAR's willingness and ability to provide false travel documents to the PLF. Specifically, those intercepts demonstrated that AL KASSAR could get such passports "even if [the PLF member] was wanted" and that AL KASSAR "was totally responsible for this issue."  According to the intercepts, AL KASSAR considered the procurement of the false passports an "easy problem" that could be "quickly resolved." All AL KASSAR needed was a passport photograph of the relevant individual so that he could "get [a] new passport" for that person.  As was evidenced by many of the intercepted conversations, AL KASSAR has sustained substantive contact with a number of members of the PLF.

15.   In addition to the procurement of false passports for members of a designated foreign terrorist organization, the Swedish intercepts also demonstrated AL KASSAR's involvement in weapons transactions.  During one of the intercepted calls, AL KASSAR discussed the fact that he had lost a suitcase while

10

traveling which contained both a false passport for a PLF member and weapons "catalogs" regarding a weapons transaction AL KASSAR then was involved in. During this call, AL KASSAR expressed concern over the loss of the suitcase and his desire for its swift return.

16. In addition to the Swedish intercepts, other evidence previously obtained by the DEA demonstrated AL KASSAR's close connections with the PLF. Specifically, a witness ("W-4"), who had previously provided reliable information to the DEA, advised the DEA that in or about the 1980's, he was with AL KASSAR when AL KASSAR transported bags of weapons to an apartment. W-4 understood from AL KASSAR that the weapons they moved to this location were to be -- and later were -- picked up by Mohamed Ghadban, the leader of the European faction of the PLF.

**AL KASSAR's Prior Admissions Regarding Arms Dealing**

17. Significantly, AL KASSAR himself has admitted his history as an arms dealer. Indeed, in an interview with *The Guardian* in October 2006, AL KASSAR stated that he had "retired from the arms business." AL KASSAR boasted that he became an arms dealer in the early 1970's when he procured weapons from Poland on Yemen's behalf.[6] He admitted that in his career as an

---

[6]AL KASSAR's admissions regarding his sales to Yemen of arms that were procured in Poland are consistent with W-1's

11

arms trafficker he engaged in business with "bad people" but claimed to the reporter that the "bad people for you may be the good people for me." When asked about his relationship with Uday Hussain, and whether he had supplied weapons to the Iraqi insurgency, AL KASSAR admitted his association with the Hussain family and stated that it would be "an honour" to support the insurgency. In the interview, AL KASSAR referred to Abu Abbas as a "hero." AL KASSAR also admitted to engaging in money laundering, boasting "If you have the money, I will move it."

**AL GHAZI's Prior Admissions Regarding Arms Dealing With AL KASSAR**

18. The witness ("W-5") who first made contact with AL KASSAR as part of the instant investigation also gave the DEA, prior to any contact with AL KASSAR, historical information regarding AL KASSAR and his criminal activities.[7] W-5's historical information provided further evidence of AL KASSAR's predisposition to participate in unlawful weapons transactions.

19. Specifically, W-5 advised that he first met AL GHAZI in Lebanon in May of 2005. W-5 was able to gain an introduction to

---

information that AL KASSAR diverted weapons obtained in Poland to Yemen. These admissions also corroborate the code and shopping lists found in the Polish safe house and demonstrate that that location indeed was used by AL KASSAR to conceal documents related to his weapons transactions.

[7] W-5 is not one of the confidential sources referenced in the Indictment.

12

AL GHAZI because he (W-5) claimed an interest in the PLF, the terrorist organization of which AL GHAZI previously was a member. Approximately one month after their initial meeting, W-5 and AL GHAZI had lunch in Lebanon and discussed AL GHAZI's interest in the PLF.  During this meeting, AL GHAZI admitted to being a former member of the PLF and to maintaining positive contacts with the terrorist group.  According to W-5, AL GHAZI helped arrange for Abu Abbas to travel to Poland from Yugoslavia after his (Abbas') participation in the *Achille Lauro* hijacking. During this June 2005 meeting, AL GHAZI also told W-5 that he and an associate had prepared to assassinate Egyptian President Anwar Sadat during a visit President Sadat made to the Ivory Coast.  AL GHAZI also admitted to W-5 to participating in weapons transactions.  AL KASSAR was not discussed.

21.  AL GHAZI and W-5 met again in August 2005.  AL GHAZI told W-5 that AL KASSAR recently had shipped arms to Somalia.[8] According to what AL GHAZI told W-5, AL KASSAR had asked him (AL GHAZI) to participate in the transaction but later chose to work with another individual.  AL GHAZI further told W-5 that AL

---

[8]A 2001 Resolution issued by the General Assembly of the United Nations concluded that AL KASSAR violated arms embargoes to Somalia (and Croatia) in 1992.

13

KASSAR registered the boat used to transport the weapons to Somalia in AL GHAZI's name.[9]

22.  During these August 2005 meetings, AL GHAZI also told W-5 of problems AL KASSAR faced from competition from his (AL KASSAR's brother).  Specifically, AL GHAZI stated that AL KASSAR's brother also sold weapons to violent factions around the world and was undercutting AL KASSAR's price to a degree that made it difficult for AL KASSAR to make a profit.

23.  In addition, AL GHAZI told W-5 that AL KASSAR had ordered the murder, which later was attempted by a PLF member Gawad Ghazoul without success, of a former associate, Elias Awad.  According to AL GHAZI, AL KASSAR ordered Awad to be killed because AL KASSAR believed that Awad was interfering with his relationship with Yasir Arafat, the former and now-deceased leader of the Palestine Liberation Organization ("PLO") and believed to be cooperating with Israeli intelligence.[10]

---

[9]It was during this meeting when AL GHAZI admitted to W-5 that the documents related to a weapons transaction and found in the safe house in Poland were AL KASSAR's and his.

[10]In a sworn statement made in Court around the time of his arrest on charges related to this incident, Gawad Ghazoul admitted that he attempted to murder Awad on the orders of AL KASSAR.  Another co-conspirator, Ahmed Boumershed, further admitted that it was AL KASSAR who provided the weapons used in the attempted murder.

14

24. At the end of this meeting, W-5 told AL GHAZI that he (W-5) had a job for AL GHAZI which he would discuss with him in the future.

25. Approximately one week later, W-5 and AL GHAZI met to discuss W-5's "job." W-5 told AL GHAZI that he had an associate who had heard from one of AL GHAZI's and AL KASSAR's customers in Yemen about weapons deals in which they had participated and wanted them to obtain weapons for him. AL GHAZI told W-5 that most of his contacts with Yemen came from AL KASSAR's associations and that, as a result, AL KASSAR likely would want to be involved in any deal with W-5's associate. When asked if AL KASSAR would be involved in such a deal, AL GHAZI told W-5 that he would but that he (AL GHAZI) was concerned that AL KASSAR would try to avoid paying them any commission. AL GHAZI also told W-5 that if AL KASSAR were to participate in such a transaction, he would, as was typical, want an end-user certificate to give to the weapons manufacturer in Poland to attempt to conceal the nature of the deal.

26. A few months later, W-5 and AL GHAZI spoke over the telephone and AL GHAZI inquired as to whether W-5's associate had acquired the end-user certificate. W-5 told AL GHAZI that he had not yet obtained such a certificate. In the weeks that followed, W-5 and AL GHAZI had numerous telephone conversations regarding

15

W-5's associate's progress in attempting to obtain an end-user certificate for a weapons deal AL GHAZI would put together with AL KASSAR.

27.  On or about November 14, 2006, W-5 and AL GHAZI met in Lebanon to discuss the weapons transaction.  During this meeting, W-5 gave AL GHAZI a copy of an end-user certificate for weapons he claimed his associate wanted to purchase through AL GHAZI and AL KASSAR.  Upon looking at the certificate, which contained the list of weapons W-5's associate allegedly wanted to buy, AL GHAZI responded that it was a small order.  W-5 told AL GHAZI that, if successful, the order could be the beginning of a long-term relationship as his associate was looking for someone, like AL KASSAR, with a reputation as a reliable arms dealer.  AL GHAZI then agreed to set up a meeting for W-5 with AL KASSAR.

The above-described historical information regarding AL KASSAR's arms dealing and assistance to a designated foreign terrorist organization plainly demonstrates AL KASSAR's predisposition to engage in such criminal activity in the future. However, AL KASSAR's predisposition was not demonstrated solely through historical information, but indeed through his own conduct during the time period and in furtherance of the conspiracies charged in the Indictment.

16

## AL KASSAR'S WILLING PARTICIPATION IN THE CHARGED CONSPIRACIES

29.  In addition to the above-described historical information regarding AL KASSAR's predisposition to engage in criminal activity, including unlawful weapons transactions, AL KASSAR's statements made to the confidential sources during the instant investigation and his actions voluntarily taken in furtherance of the weapons deal further demonstrate that AL KASSAR's intent to engage in such criminal activity was not improperly induced, and instead was formed of his own volition.

30.  Specifically, on or about December 28, 2006, W-5 first met with AL KASSAR to discuss the proposed weapons transaction. W-5, AL KASSAR and AL GHAZI met in Lebanon at which time AL KASSAR invited W-5's associate who wanted to purchase the weapons to meet with him at his residence in Marbella, Spain, to discuss the specifics of the transaction.

31.  On or about February 6 and 7, 2007, W-5 introduced two confidential sources working with the DEA ("CS-1" and "CS-2") to AL KASSAR, AL GHAZI and MORENO at AL KASSAR's residence in Marbella, Spain.[11]  W-5 introduced CS-1 and CS-2 as members of

---

[11]CS-1 and CS-2 previously provided other information to the DEA which was corroborated and deemed reliable.  CS-1 and CS-2 are the confidential sources identified as "CS-1" and "CS-2" in the Indictment.

17

the FARC who were interested in purchasing weapons through AL KASSAR.

32.  During the February meetings, CS-1 and CS-2 told AL KASSAR that the FARC was involved in a revolution against the United States.  AL KASSAR asked CS-1, "Against or with the America?"  CS-1 then asked AL KASSAR what he meant.  When AL KASSAR said, fighting against United States or receiving help from the United States, CS-1 laughed and stated "fighting against the United States."  AL KASSAR stated and confirmed that he was also against the United States and was willing to support the CSs invasion against the United States.  AL KASSAR advised that they should "work safe" because the Americans were "watching."

33.  The CSs then provided AL KASSAR and AL GHAZI with lists of the following weapons that the FARC wanted to purchase:  (1) 4,350 AKM assault rifles; (2) 3,350 AKMS assault rifles; (3) 200 RPK assault rifles; (4) 50 Dragunov sniper rifles; (5) 500 Makarov pistols; (6) 2,000,000 rounds of 7.62mm x 39mm ammunition; (7) 120 RPG grenade launchers; (8) 1,650 PG-7V grenade rounds; and (9) 2,400 RGO-78 hand grenades.  During one meeting, AL KASSAR spoke over the telephone with an unidentified co-conspirator, and told this individual to contact people in

18

Romania and Yugoslavia to obtain prices for the weapons requested by the CSs.[12]

34.   AL KASSAR also offered to provide the FARC with training in the use of high explosives through the use of remote detonators, and also offered 1,000 men to be sent to help the CSs' cause in Colombia.

35.   Further discussions at these meetings detailed AL KASSAR's willingness and agreement to divert the weapons from Nicaragua to Suriname, even though the weapons were destined for Nicaragua.  AL KASSAR agreed to deliver the weapons to Suriname for CS-1 and CS-2 using his vessel and his boat captain and asked CS-1 and CS-2 to provide the name of the port where the weapons would be received.  During this conversation, AL KASSAR spoke with his boat captain by telephone and advised him about the upcoming delivery.  AL KASSAR also told CS-1 and CS-2 how the boat captain had been working for him for approximately 30 years and that he had never been detained or arrested on charges of arms trafficking.[13]

---

[12]AL KASSAR's ability to immediately reach out during the meeting to an individual to request prices for the weapons strongly suggests that AL KASSAR had engaged in similar transactions with that individual on prior occasions.

[13]AL KASSAR's ability to immediately contact an individual for purposes of arranging the weapons transport corroborates AL KASSAR's admission to CS-1 and CS-2 that he had engaged in other

36.   W-5 then gave AL KASSAR the original Nicaraguan end-user certificate for the purchase of the requested weapons.   AL KASSAR expressed irritation with the certificate because it did not contain a seal or stamp that authenticated the documents.   AL KASSAR, again indicating predisposition, told CS-1 and CS-2 that he could have one of his contacts at the weapons manufacturer validate the certificate but would, in the first instance, attempt to deal with an arms company that would not try to authenticate the certificate.   AL KASSAR told CS-1 and CS-2 that he had the means to obtain another end-user certificate for approximately $200,000, if necessary.

37.   During these February 2007 meetings, AL KASSAR agreed to sell and deliver the weapons on behalf of the FARC for a cost of €6-8 million, one million of which would be for the transportation fee.   AL KASSAR told CS-1 and CS-2 that he would not place the order until a substantial payment was made.   AL KASSAR also agreed to accept payment for the weapons in cash and indicated that he was willing to launder over €20 million Euros for the CSs.[14]   AL KASSAR stated that he could receive money in

_____

weapons transactions with the boat captain.

[14]AL KASSAR's offer to launder money on behalf of the FARC is strongly corroborative of the fact that AL KASSAR had engaged in similar activity in the past and was not agreeing to perform such a function for the terrorist organization because improperly

the United Kingdom, Lebanon and Spain and would charge a 10%
commission to "wash" the money.  AL KASSAR also advised that he
could launder money through fraudulent real estate transactions
for which he would charge a lower commission.

38.  AL KASSAR also enlisted CS-1 and CS-2 to obtain false
passports for him and certain of his associates.

39.  On or about March 27 and 28, 2007, W-5, CS-1 and CS-2
again met with AL KASSAR, AL GHAZI and MORENO at AL KASSAR's
residence in Marbella, Spain, to discuss the sale of weapons to
the FARC.  Prior to the meeting, AL GHAZI, based upon his prior
dealings with AL KASSAR in similar transactions, advised the CSs
on how best to negotiate with AL KASSAR for the purchase of
weapons.

40.  Once together, AL KASSAR, AL GHAZI, MORENO, W-5, CS-1
and CS-2 discussed the fact that the FARC financed its terrorist
activities with proceeds from its cocaine trafficking business,
and also spoke about the FARC's need to attack United States
interests and to kill United States nationals in Colombia.  AL
KASSAR agreed to provide CS-1 and CS-2 with prices for surface-
to-air missile systems for the FARC to use to attack United
States military helicopters in Colombia and also provided them

_____

induced.

with (1) a specification sheet for the surface-to-air missile systems, and (2) a document describing the boat that AL KASSAR intended to use to transport the requested weapons. AL KASSAR also told CS-1 and CS-2 that he could provide them with ton-quantities of C4. When CS-2 asked if AL KASSAR could provide experts to train FARC members in the use of the C4, AL KASSAR responded that he could but that if the C4 was intended to be used to cause damage, his trainers could train the FARC to make explosive devices in Colombia with less expensive materials.

41. Also during the March 2007 meetings, AL KASSAR and MORENO provided CS-1 and CS-2 with information regarding a bank account in Spain into which the CSs were to wire transfer €100,000 to secure the services of the boat that would be used to transport the weapons to the FARC. AL KASSAR told W-5 that he was aware that the money CS-1 and CS-2 would transfer constituted drug proceeds because of the fact that the money to pay for the transaction would be sent in relatively small amounts. On or about March 28, 2007, the CSs wired €100,000 to that account from an undercover DEA account in New York, New York.

42. Following the March 2007 meetings, W-5, CS-1 and CS-2 continued to communicate with AL KASSAR, AL GHAZI and MORENO regarding the weapons transaction by telephone and email. In addition, AL KASSAR and MORENO provided the CSs with information

22

for two other bank accounts into which they requested payment for the weapons be made.

43. On or about May 9, 2007, AL KASSAR called CS-1 to advise that he was in Bulgaria and would travel to Romania on May 10 to "formalize everything" in connection with the weapons transaction. AL KASSAR indicated that he was anxious to receive an additional payment so that he could pay the boat captain and boat owner who would transport the weapons, and also the weapons manufacturer.

44. Also on or about May 9, 2007, AL KASSAR received another $50,000 from the DEA undercover account in New York, New York in furtherance of the weapons sale. In total, AL KASSAR, AL GHAZI and MORENO received more than $400,000 from the DEA undercover bank accounts, one of which was in New York, New York. This money was represented to be payments from the FARC for the weapons AL KASSAR agreed to provide.

45. On or about May 10, 2007, CS-1 told AL KASSAR that he was unable to obtain another end-user certificate. AL KASSAR responded that he could obtain one but that he would charge between 15 and 20% of the value of the transaction for such a certificate. AL KASSAR further told CS-1 that the payments made to date amounted to "almost nothing" and that a more substantial

payment would need to be made soon because he had to "take care of the contract" in Romania.

46.  In late May 2007, AL KASSAR told W-5 that he was in Romania meeting with the weapons manufacturer and that the manufacturer was not satisfied with the amount of payment they had received to date.  AL KASSAR told W-5 that he had made a payment to the manufacturer on W-5's behalf to "calm down those people."  W-5 then told AL KASSAR that €3,500,000 soon would be available in Romania to which AL KASSAR responded that he had representatives in Romania who could take possession of the money on his behalf.

47.  During this call, AL KASSAR told W-5 that he soon would travel to Greece to finalize the arrangements with the boat captain and boat owner.  AL KASSAR agreed to return to Romania on June 6, 2007, to meet with W-5 and purported representatives of the FARC, and to receive a €3,500,000 payment from the FARC.

48.  On or about June 6, 2007, MORENO and AL GHAZI arrived in Bucharest, Romania, to coordinate the receipt of the payment on behalf of AL KASSAR.  MORENO and AL GHAZI both said that they had spoken to AL KASSAR that day.  According to AL GHAZI, AL KASSAR initially said that he would not travel anywhere until payment was made by W-5, and later stated that he would travel only if W-5 first showed the money to AL GHAZI.  MORENO later

24

spoke to AL KASSAR and told W-5 that AL KASSAR had told him that

he would not travel anywhere unless W-5 first made payment, or at

least showed the money that would constitute payment to MORENO.

49.  In addition to the fact that the historical information

known to the DEA prior to the commencement of the instant

investigation evidenced AL KASSAR's predisposition to commit the

charged crimes, AL KASSAR's conduct during the course of the

charged conspiracies further evidenced such predisposition.

Indeed, AL KASSAR took a number of specific steps to carry out

his illegal agreement that evidenced both his willingness and

capacity to procure the dangerous weapons for the FARC terrorist

organization, and also demonstrated the fact that he had a long

history as an illegal weapons dealer.  For example, after

agreeing to sell weapons to the FARC, AL KASSAR reached out to

certain of his contacts with whom he previously engaged in

weapons transactions.  First, AL KASSAR immediately telephoned an

associate to task that associate with obtaining a price list for

the requested weapons.  In addition, AL KASSAR reached out to the

owner and captain of a boat whose services he previously used to

transport illegal weapons.  Indeed, at the May 2, 2007 meeting

between AL KASSAR and CS-1 and CS-2, AL KASSAR introduced the CSs

to the boat owner and boat captain and told the CSs that they had

moved weapons for him over the course of the last 25 years.[15]

Thus, during the course of the investigation, AL KASSAR confirmed

what the DEA already had learned from multiple sources prior to

any contact between the CSs and AL KASSAR: AL KASSAR was a long-

time arms dealer.

50.  Second, AL KASSAR's intent to engage in the charged

criminal activity was not exclusively created as a result of the

CSs contact with him was further borne out from other statements

and conduct made by AL KASSAR during the operation.  For example,

AL KASSAR's knowledge of the necessity of an end-user certificate

to attempt to legitimize an unlawful weapons transaction and his

claimed facility to procure a false certificate demonstrate that

he had engaged in such conduct before.  In addition, without

having previously engaged in this kind of deal, AL KASSAR would

not have had the knowledge that a cover load of materials, or

"fillers," would be necessary for the boat's return trip from

Suriname.  Furthermore, AL KASSAR's offer to provide 1,000 men to

fight against the United States alongside the FARC also

---

[15]The boat owner's and boat captain's participation in arms
dealing was confirmed in or about 2001 when their boat, which was
the boat that was to transport the FARC's weapons, was stopped in
international waters and approximately 236 metric tons of weapons
were found onboard.

demonstrates a wealth of resources cultivated over a career as an

arms dealer who provided support to violent organizations.

51.   Third, it was AL KASSAR who suggested both the

introductions in Romania and that his continued meetings with the

CSs occur in his country, a reference to Spain, rather than

Lebanon as initially proposed by the CSs.  It also was AL KASSAR

who repeatedly and urgently demanded payment for the deal, and it

was AL KASSAR who fronted money to the weapons manufacturer on

the FARC's behalf.  In other words, although the transaction

initially was proposed by the CSs, once AL KASSAR agreed, he

drove the transaction.

52.   Finally, AL KASSAR provided documents to the CSs which

evidenced his intent to engage in the charged criminal activity.

This physical evidence included: (1) a photograph of the vessel

to be used to transport the weapons; (2) a specification sheet

for the SAMs he agreed to sell; and (3) written information on

bank accounts in fictitious names that he controlled in Spain and

Lebanon to receive payment.

53.   Accordingly, given the historical information about AL

KASSAR's criminal past known to the DEA at the time the instant

investigation began, together with the fact that AL KASSAR

quickly and completely availed himself of the opportunity to

engage in the charged criminal activity, demonstrates that AL

27

KASSAR was not improperly induced to commit the charged crimes
but instead was predisposed to commit them.  As such, the use of
confidential sources during this investigation was permissible
under United States law.


LESLIE C. BROWN
ASSISTANT UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK


SWORN TO AND SUBSCRIBED BEFORE
ME THIS 28th DAY OF June 2007


HONORABLE JED S. RAKOFF
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK