UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                          :
UNITED STATES OF AMERICA                  :
                                          :
        - v. -                            :           S3 07 Cr. 354 (JSR)
                                          :
MONZER AL KASSAR,                         :
        a/k/a "Abu Munawar,"              :
        a/k/a "El Taous,"                 :
TAREQ MOUSA AL GHAZI, and                 :
LUIS FELIPE MORENO-GODOY,                 :
                                          :
                Defendants.               :
                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO MONZER AL KASSAR'S MOTION TO DISMISS AND FOR OTHER RELIEF

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
        of America

BOYD M. JOHNSON III
LESLIE C. BROWN
BRENDAN R. MCGUIRE
Assistant United States Attorneys
        - Of Counsel -

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      The Motion To Dismiss Based on Alleged "Materially False
        and Misleading" Extradition Affidavits Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                1.      The February 6-7, 2007 Meetings
                        And The March 6, 2007 Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                2.      The March 26-27, 2007 Meetings And
                        Subsequent Conversations And E-Mail. . . . . . . . . . . . . . . . . . . . . . . . 8

II.     The Government Agrees To Identify Known Accomplices . . . . . . . . . . . . . . . . . . . . . . . 13

III.    The Motion For A Bill Of Particulars Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.     The Motion To Compel The Government To Identify
        And Produce Its Confidential Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        B.      Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V.      The Motion For Additional Discovery Should Be Denied . . . . . . . . . . . . . . . . . . . . . . 21

VI.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

## TABLE OF AUTHORITIES

*Cases:*

*DiBlasio v. Keane,*
        932 F.2d 1038 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*Frisbie v. Collins,*
        342 U.S. 519 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Head Money Cases,*
        112 U.S. 580 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Matta-Ballesteros v. Henman,*
        896 F.2d 255 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Rovario v. United States,*
        353 U.S. 53 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Andrews,*
        381 F. 2d 377 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Awadallah,*
        202 F. Supp. 2d 17 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Bortnovsky,*
        820 F.2d 572 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Broward,*
        594 F.2d 345 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Brunson,*
        No. 97 Cr. 398 (RSP), 1998 WL 146271 (N.D.N.Y. Mar. 26, 1998) . . . . . . . . . . . . . 18

*United States v. Carroll,*
        510 F.2d 507 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Castro,*
        No. 94 Cr. 809 (JFK), 1995 WL 6235 (S.D.N.Y. Jan. 6, 1995) . . . . . . . . . . . . . . . . . 18

*United States v. Cimino,*
        31 F.R.D. 277 (S.D.N.Y. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. De La Pava,*
        268 F.3d 157 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*United States v. Fields,*
        113 F.3d 313 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Goldman,*
        439 F. Supp. 352 (S.D.N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*United States v. Herbert,*
        313 F. Supp. 2d 324 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

*United States v. Jackson,*
        345 F.3d 59 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Jimenez,*
        789 F.2d 167 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Jimenez,*
        824 F. Supp. 351 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19-21

*United States v. Leighton,*
        265 F. Supp. 27 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*United States v. Leonelli,*
        428 F. Supp. 880 (S.D.N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

*United States v. Muyet,*
        945 F. Supp. 586 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19-21

*United States v. Palermo,*
        2001 WL 185132 (S.D.N.Y. Feb. 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*United States v. Panza,*
        750 F.2d 1141 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

*United States v. Ramirez,*
        602 F. Supp. 783 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*United States v. Reed,*
        639 F.2d 896 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

*United States v. Rommy,*

506 F.3d 108 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

*United States v. Ruiz,*
702 F. Supp. 1066 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*United States v. Saa,*
859 F.2d 1067 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 19

*United States v. Shamsideen,*
2004 WL 1179305 (S.D.N.Y. March 31, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 18

*United States v. Shoher,*
555 F. Supp. 346 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*United States v. Sindone,*
2002 WL 48604 (S.D.N.Y. Jan. 14, 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15, 19

*United States v. Torres,*
901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

*Wong Tai v. United States,*
273 U.S. 77 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3550  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Fed. R. Crim. P. 16  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 21

Fed. R. Crim. P. 7(f)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
UNITED STATES OF AMERICA                      :
                                              :
        - v. -                                :          S3 07 Cr. 354 (JSR)
                                              :
MONZER AL KASSAR,                             :
        a/k/a "Abu Munawar,"                  :
        a/k/a "El Taous,"                      :
TAREQ MOUSA AL GHAZI, and                     :
LUIS FELIPE MORENO-GODOY,                     :
                                              :
                Defendants.                   :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO MONZER AL KASSAR'S MOTION TO DISMISS AND FOR OTHER RELIEF

The Government respectfully submits this memorandum in opposition to the motion of

defendant Monzer al Kassar ("al Kassar") to: (1) dismiss the Indictment under the Due Process

Clause because the extradition of the defendants was allegedly predicated on "false and

misleading affidavits"; (2) compel the Government to identify known accomplices; (3) compel

the Government to provide a bill of particulars; (4) compel the Government to disclose the

identity of its confidential sources and to produce those sources for interviews; (5) compel the

Government to produce various items pursuant to Rule 16 of the Federal Rules of Criminal

Procedure; and (6) permit al Kassar to file additional motions. As discussed below, the Court

should deny al Kassar's motion to dismiss the Indictment, and his motions to compel the

Government to provide a bill of particulars, identify and produce confidential sources, and

produce additional discovery. The Government agrees to provide the defendants with the

identities of known accomplices and their roles in the charged conspiracies. The Government

also consents to an application by al Kassar to file an additional motion to suppress his post-

arrest statements.[1]

## I.  THE MOTION TO DISMISS BASED ON ALLEGED "MATERIALLY FALSE AND MISLEADING" EXTRADITION AFFIDAVITS SHOULD BE DENIED

Al Kassar seeks dismissal of the Indictment on due process grounds, contending that the

"extradition of the Defendants was predicated on materially false and misleading affidavits."

(See Memorandum of Law of Defendant Monzer al Kassar in Support of His Motion to Dismiss

the Indictment and for Other Relief, dated July 15, 2008 ("al Kassar Br."), at 2-6).  Al Kassar

cites no legal authority for the proposition that inaccuracies in extradition affidavits violate due

process and compel the extraordinary remedy of dismissal.  Moreover, applicable law strongly

suggests that al Kassar does not have standing to challenge any irregularities in his extradition

proceedings.  In any event, the portions of the extradition affidavits challenged by al Kassar were

not "materially false and misleading," but rather fairly described the substance of conversations

between the defendants and the DEA confidential sources concerning the FARC weapons deal.

Accordingly, al Kassar's motion to dismiss should be denied.

## A.  Applicable Law

For more than a century, "the Supreme Court has consistently held that the manner in

which a defendant is brought to trial does not affect the ability of the government to try him."

Matta-Ballesteros v. Henman, 896 F.2d 255, 260 (7th Cir. 1990).  In Frisbie v. Collins, 342 U.S.

519 (1952), the Supreme Court explained that this rule

---

[1]  Al Kassar seeks to join his co-defendants' motions.  For the same reasons discussed in the Government's Memorandum In Opposition To Defendants' Motion To Dismiss And For Other Relief, dated May 5, 2008 ("Govt's First Br."), the Government submits that these motions should be denied as to al Kassar.

> rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

342 U.S. at 522; see also United States v. Reed, 639 F.2d 896, 901 (2d Cir. 1981) ("the Government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him"); United States v. Awadallah, 202 F. Supp. 2d 17, 41 (S.D.N.Y. 2002) ("Under the long-standing Ker-Frisbie doctrine, the manner in which an indicted individual comes before a court does not affect the court's jurisdiction.").

Moreover, "[a]s the Supreme Court has long observed, absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed by the signatory sovereigns through diplomatic channels." United States v. Rommy, 506 F.3d 108, 129 (2d Cir. 2007) (citing Head Money Cases, 112 U.S. 580, 598 (1884)). "For any number of reasons, sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases. Thus, a proper respect for the diplomatic choices of sovereign nations prompts courts generally to apply 'a strong presumption against inferring individual rights from international treaties.'" Id. at 130 (citing United States v. De La Pava, 268 F.3d 157, 164 (2d Cir. 2001)). Courts have found, however, that a defendant may have standing to raise violations of an extradition treaty "where the extradition has violated the rule of speciality or where the United States government participated in shocking and outrageous conduct in securing the presence of the defendant." United States v. Herbert, 313 F. Supp. 2d 324, 331 (S.D.N.Y. 2004).

3

**B.    Discussion**

Against this backdrop, there is simply no legal support for al Kassar's contention that allegedly false or misleading statements in an extradition affidavit require the dismissal of an otherwise valid indictment on due process grounds.  To the contrary, even if al Kassar's allegations were correct (which they are not), "the Government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him."  United States v. Reed, 639 F.2d at 901.  Moreover, absent explicit treaty language conferring individual rights – which al Kassar cannot allege here because the extradition treaty with Spain does not contain such language – "treaty violations are generally addressed by the signatory sovereigns through diplomatic channels."  United States v. Rommy, 506 F.3d at 129.  Although there is some support for the proposition that "shocking and outrageous conduct" relating to a defendant's extradition may implicate due process – see United States v. Herbert, 313 F. Supp. 2d at 331 – misleading statements in an extradition affidavit do not fall within that category and do not justify the extraordinary remedy of dismissal.  See United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979) (reversing dismissal of indictment based on alleged false material in affidavits for arrest and search warrants because there "was no finding of widespread or continuous official misconduct of the dimensions necessary to warrant imposition of the sanction of dismissal").  Accordingly, al Kassar's motion is baseless.

More fundamentally, Agent Brown's descriptions of the six recorded conversations and one e-mail contained in his extradition affidavits were not "materially false and misleading." (See al Kassar Br. at 2).  Al Kassar elides the beginning of Agent Brown's two affidavits, where he stated that his descriptions of conversations that have occurred were "described in substance

4

and in part." (See Exhibit A to Affidavit of Elliott Z. Stein in Support of Monzer Al Kassar's

Motion to Dismiss the Indictment and Other Relief, dated July 15, 2008 ("Stein Aff."), at ¶ 5

(emphasis added)). Thus, the affidavits make clear that they contain "descriptions of

conversations," and not verbatim recitations of the conversations. Moreover, when these

conversations are placed in the overall context of the defendants' negotiation of the weapons deal

– as they are in his extradition affidavits – Agent Brown's descriptions of these six conversations

and one e-mail are in no way false and misleading, and do not "profoundly mischaracterize" the

conversations as al Kassar contends. (See al Kassar Br. at 3).

### The February 6-7, 2007, Meetings And The March 6, 2007 Call

As recounted in Agent Brown's extradition affidavits, on February 6, 2007, al Kassar and

Tareq Mousa al Ghazi ("al Ghazi") met with three DEA confidential sources ("Samir," "Carlos,"

and "Luis")[2] at al Kassar's Marbella, Spain, residence. (See Exhibit A to Stein Aff. at ¶ 24;

Exhibit B to Stein Aff. at ¶ 34). During the February 6, 2007, meetings, al Kassar and al Ghazi

learned that Carlos and Luis represented the FARC, and that they were interested in purchasing

weapons through al Kassar in order to fight the United States. (Id.; see also DEA Form 6, Post-

Arrest Interview of Tareq al Ghazi on October 16, 2007 ("al Ghazi 6"), attached as Exhibit A

hereto, at ¶ 17). Carlos also told al Kassar, and al Kassar in turn informed al Ghazi, that although

---

[2]    In order to avoid confusion, the Government has identified the DEA confidential
sources in this brief by the first names they used during their negotiations with the defendants.
The Government identified these confidential sources in various ways in the extradition
affidavits and in the Indictment. More specifically, in Agent Brown's Spain extradition affidavit,
Samir was identified as "W-5," Carlos was identified as "CS-1," and Luis was identified as "CS-
2." In Agent Brown's Romania extradition affidavit, Samir was identified as "W-3," Carlos was
identified as "CS-1," and Luis was identified as "CS-2." In the Indictment, Samir was not
identified, Carlos was identified as "CS-1," and Luis was identified as "CS-2."

the end-user certificate indicated that the weapons were to be delivered to Nicaragua, the FARC in fact wanted the weapons delivered to Suriname. (Id.; al Ghazi 6 at ¶ 17 ("Once [Carlos] and [Luis] arrived in Marbella and were introduced to al Kassar, al Ghazi learned from al Kassar that the weapons were not going to Nicaragua but were going to be diverted to a group in Colombia known as the FARC. The weapons were intended to be diverted to Suriname or another port.").

Later that evening, al Kassar offered to send 1,000 men to Colombia to fight with Carlos, Luis and the FARC against the United States. (See Exhibit A to Stein Aff. at 32; Exhibit B to Stein Aff. at 42). Al Kassar told Carlos that they were fighting for the same cause, and offered to supply experts to train the FARC to use high-powered explosives, as well as to supply the FARC with quantities of C4 explosives. (Id.). Al Ghazi was aware of the discussions regarding the FARC's desire to obtain C4 explosives to use in Colombia against the Americans. (See al Ghazi 6 at ¶ 21 ("Al Ghazi recalled the discussions about [Carlos] and [Luis] wanting to purchase C4 and other explosives for the FARC to use in Colombia against the Americans.").

After the February 2007 meetings, on March 6, 2007, Samir spoke with al Ghazi over the telephone. In his extradition affidavits, Agent Brown described the substance of this call as involving a discussion of "the need for AL KASSAR to get quantities of C4 explosives for [Carlos], [Luis], and the FARC," as well as "the amount of time that it was taking to complete the deal, and issues relating to the commissions both men hoped to obtain from AL KASSAR as part of the deal." (See Exhibit A to Stein Aff. at ¶ 36; Exhibit B to Stein Aff. at ¶ 46). According to the Government's current draft transcript,[3] during this call, Samir informed al

---

[3]      On June 16, 2008, the Government and al Kassar entered into a draft transcript stipulation in this case. In the stipulation, the parties agreed in writing that the Government was

(continued...)

6

Ghazi: "[T]hey requested with the shipment some stuff . . . you know . . . the C4 . . . that stuff," to which al Ghazi replied: "Yeah." (See Exhibit C to Stein Aff. at 3971). Later in the call, al Ghazi, referring to al Kassar, stated: "He is patient but you know the circumstances." Samir replied: "No, I don't want to hear about the circumstances, Tariq. We are almost there. Forget the circumstances." Al Ghazi then stated: "We are, but they must hurry up. That's what is meant. This is what I meant because we promised them. That's it." (Id. at 3972). During the call, after al Ghazi informed Samir that he had been "here [in Spain] for a month," Samir replied: "A month? You are staying in Spain not Sidon! We are in the same situation." (Id. at 3971).

Based on al Ghazi's participation in the February 2007 meetings, the Government's draft transcript does not support al Kassar's contention that Agent Brown's description of the substance of the March 6, 2007, telephone call was "materially false and misleading." By March 6, 2007, al Ghazi was aware of the fact that Carlos and Luis represented the FARC, and that the FARC was the organization purchasing the weapons from al Kassar. (See al Ghazi 6 at ¶ 17). Accordingly, Agent Brown's statements that Samir and al Ghazi "talked about the need for AL KASSAR to get quantities of C4 explosives for [Carlos], [Luis], and the FARC" and that they also "discussed the amount of time that it was taking to complete the deal" fairly described the

---

[3](...continued)
providing draft transcripts "for the convenience of the defendant and defense counsel, and that they will be used only for the purposes of trial preparation and for no other purpose." Notwithstanding this agreement, al Kassar has relied on the Government's draft transcripts to move to dismiss the Indictment. In any event, as discussed above, the draft transcripts fail to establish that Agent Brown's extradition affidavits were false or misleading in any way, and the Government has itself therefore relied on the draft transcripts in this opposition. The Government reserves the right, however, to continue to finalize the draft transcripts in preparation for trial, and will in the future seek to hold al Kassar and his co-defendants, who previously executed the same draft transcript stipulation, to their agreement.

substance of the call. Samir specifically referred to C4 in the call, and al Ghazi told Samir that the purchasers, i.e., the FARC, had to "hurry up."

Similarly, at the time of the March 6, 2007, call, al Ghazi believed that both he and Samir would obtain a commission from al Kassar sale of the weapons. See al Ghazi 6 at ¶ 14 ("AL GHAZI was solely interested in making money on the transaction for [Samir] and himself. AL GHAZI believed that he would make between 100,000 and 150,000 euros for assisting in brokering the weapons transaction."). Samir's statement that "[w]e are in the same situation" reflected the fact that both men were ultimately dependent on the other participants in the deal for their commissions. Agent Brown's statement in his extradition affidavits that al Ghazi and Samir discussed issues relating to commissions in this call was therefore not materially false or misleading.

### The March 26-27, 2007, Meetings And Subsequent Conversations And E-Mail

The remaining calls and e-mail highlighted by al Kassar all occurred after the March 26-27, 2007, meetings between the three defendants and the DEA confidential sources in Marbella. During those meetings, as described in Agent Brown's affidavits, al Kassar, Moreno, Carlos and Luis spoke extensively about the FARC's illegal activities in Colombia and about its conflict against the United States. (See Exhibit A to Stein Aff. at ¶ 39; Exhibit B to Stein Aff. at ¶ 49). They also discussed the FARC's need to procure surface-to-air missile systems ("SAMs") from al Kassar to be used against U.S. helicopters. (Id. at ¶¶ 41, 53). As outlined below, the Government's current draft transcripts, all of which have been produced to the defendants, provide a detailed account of these discussions.

For example, on March 26, 2007, al Kassar, Carlos and Luis had the following exchange:

8

CARLOS:          You know that our . . . our group . . . our
                 group, the . . . the FARC . . .

AL KASSAR:       Right.

CARLOS:          . . . they . . . they've never done a deal like
                 the one we're doing now.  Our deals usually
                 involve, uh . . . we exchange the product for
                 . . . the arms and then, uh . . . it's not . . .
                 they don't like to give any money.  So this is
                 new.  And in addition to that, the Americans
                 are much more in our faces lately, much
                 more so with us.

AL KASSAR:       Hm.  All over the world.

CARLOS:          All over the world.  So . . .

AL KASSAR:       [Unintelligible]

CARLOS:          So we want to start doing this.  They're not
                 going to be to deal with it at all, with that as
                 the situation and also being there to fight
                 against us.  So that means that . . . that's our
                 idea, we'll start, um . . . we wanted to add a
                 few things that . . . that . . . that . . . that they
                 had asked me about.  The, um . . . the . . . the
                 PG 7s, those . . . those [things] can't be used
                 for the new helicopters.

AL KASSAR:       What . . .?  What . . .? [Unintelligible]

CARLOS:          No, but they're the . . . the PG 16s and 18s are . . .
                 are what they're asking me about.

AL KASSAR:       Uh huh.

CARLOS:          Because . . .

AL KASSAR:       They're good for everything, for all of those helicopters.

(See Government Draft Transcript, attached hereto as Exhibit B, at control numbers 4794-4796).

9

Later that day, al Kassar, Moreno, Carlos and Luis continued discussing the FARC and its

need to attack U.S. helicopters in Colombia:

| | |
|---|---|
| CARLOS: | You know, the Americans are bringing . . . they just brought those . . . those . . . those, uh the Apaches into Colombia. |
| AL KASSAR: | [Unintelligible] |
| LUIS: | [Unintelligible] |
| CARLOS: | And they're . . . they're making attacks. That's why we want to start to . . . to . . . to kill all of them. |
| LUIS: | We have to hit them hard. |
| CARLOS: | And kill all of those Americans that are bringing in those Apaches . . . |
| AL KASSAR: | And look at what's going on in Iraq. |
| | *     *     * |
| CARLOS: | And they're scared in Iraq. |
| AL KASSAR: | That's right. |
| | *     *     * |
| CARLOS: | . . . we made an agreement with the Colombian government, and . . . and . . . and we were going to make a truce, but then they weren't supposed to extradite any of the . . . the FARC commanders. |
| AL KASSAR: | Out of the country, uh huh, of the FARC. |
| CARLOS: | But now . . . |
| MORENO: | They are taking them away. |

10

(See Government Draft Transcript, attached hereto as Exhibit C, at control numbers 4886-4887).

Shortly thereafter, the discussion turned to the FARC's reliance on cocaine proceeds to finance their terrorist activities:

| | |
|---|---|
| MORENO: | The FARC finance themselves, but the FARC aren't producers, are they? |
| CARLOS: | Well, they are, they are. |
| MORENO: | Oh, all right. |
| CARLOS: | We have the laboratories. . . |
| LUIS: | Of course we do! |
| CARLOS: | . . . and that's exactly why we're talking about . . . about how we want to provide protection and start our attacks.  You know, right now with these new Apaches that . . . that Bush just gave them and he . . . and he . . . he made them an offer and then the Apaches arrived . . . |
| LUIS: | You know, Uribe . . . Uribe and Bush are like this. |
| MORENO: | They're like this. |
| LUIS: | They joined forces. . . . |
| | *     *     * |
| MORENO: | So how many FARC members are there?  Like twenty thousand, huh?  Like thirty thousand? |
| LUIS: | No, around . . . something like seventeen or twenty thousand. |
| | *     *     * |
| MORENO: | And . . . you have control over an . . . an area that's more or less the size of Andalucia.  It's big. |

11

CARLOS:          It's . . . it's a little bigger.  In other words, we have the
                 southern front and the northern front.  We have two fronts.

                 *       *       *

CARLOS:          We finance ourselves with drugs so we can buy
                 weapons and maintain our troops.

(See Government Draft Transcript, attached hereto as Exhibit D, at control numbers 4892-4897).

In his motion to dismiss, al Kassar claims that Agent Brown's descriptions of five

conversations and one e-mail from April and May 2007 were false and misleading essentially

because the corresponding draft transcripts "contain no reference whatsoever to FARC."  (See al

Kassar Br. at 4-5).  After the March 26-27, 2007, discussions outlined above, however, al Kassar

and Moreno undoubtedly knew that the organization behind the purchase of the weapons was the

FARC.  As a result, the mere fact that the word "FARC" does not appear in the draft transcripts

does not render Agent Brown's descriptions of the substance of the April and May 2007

conversations and e-mail false and misleading.  When al Kassar and Moreno spoke with Carlos

about the purchasers of the weapons, they all knew that they were talking about the FARC, and

did not need to spell it out again over the telephone.

For example, on April 18, 2007, according to the Government's current draft transcript,

Carlos told al Kassar: "[M]y boss, the boss's boss wants to . . . wants to send somebody to talk

with your . . . with your driver next week. . . And after that happens, he said that you'll have

everything in your account, all right?"  (See Exhibit D to Stein Aff. at 3414-15).  Based on the

March 26-27, 2007, discussions regarding the FARC, al Kassar understood that Carlos's

reference to his "boss's boss" was a reference to someone within the hierarchy of the FARC.  As

a result, there was nothing false or misleading about Agent Brown describing the substance of

12

this conversation as involving "the need for AL KASSAR, [Carlos], [Carlos's] representative, and CC-1 [al Kassar's boat captain] to meet soon in Spain to discuss the logistics of transporting the weapons to the FARC . . ." (See Exhibit A to Stein Aff. at 22; Exhibit B to Stein Aff. at 59).

Al Kassar's complaints about Agent Brown's descriptions of the substance of the remaining conversations and e-mail are equally without merit. Because both al Kassar and Moreno knew that the organization purchasing the weapons from them was the FARC, Agent Brown's reference to the FARC in descriptions of these conversations and e-mail did not mislead the Spanish or Romanian authorities in any way; rather, they fairly described the substance of these interactions between the defendants and the DEA confidential sources. Thus, even if there were a legal basis for al Kassar's motion, it should be denied on the ground that, contrary to al Kassar's contentions, Agent Brown's affidavits were not materially false or misleading.

## II.    THE GOVERNMENT AGREES TO IDENTIFY KNOWN ACCOMPLICES

Al Kassar moves to compel the Government to identify known accomplices. The Government agrees to identify known accomplices, and will provide such information to the defendants under separate cover.

## III.    THE MOTION FOR A BILL OF PARTICULARS SHOULD BE DENIED

Al Kassar moves the Court to compel the Government to provide him with a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. (See al Kassar Br. at 6-12). Although al Kassar requests particularization with respect to eight different areas, he is essentially requesting early discovery of Rule 404(b) evidence and predisposition evidence. The Government has previously agreed to provide notice of any such evidence four weeks before trial. (See Govt's First Br. at 27). In light of the detailed Indictment and the extensive discovery

13

previously produced to the defendants, al Kassar's request falls outside the proper scope and function of a bill of particulars. Nonetheless, the Government agrees to provide the defendants with the names of known accomplices, as indicated above, and their roles in the charged conspiracies.

A.    **Applicable Law**

The sole legitimate purpose of a bill of particulars is to furnish those facts that are necessary (1) to apprise the defendant of the charges against him with sufficient precision to enable him to prepare his defense; (2) to avoid unfair surprise at trial; and (3) to preclude a second prosecution for the same offense. United States v. Sindone, 2002 WL 48604, *1 (S.D.N.Y. Jan. 14, 2002) (Mukasey, J.) (citing Wong Tai v. United States, 273 U.S. 77, 80-82 (1927)). Therefore, a bill of particulars is only required "'where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); see also United States v. Leonelli, 428 F. Supp. 880, 882 (S.D.N.Y. 1977). The ultimate test for whether a bill of particulars should be granted is not whether the information sought is merely helpful in preparing for trial, but whether it is necessary for the limited notification purposes of a bill of particulars. See United States v. Ramirez, 602 F. Supp. 783, 793 (S.D.N.Y. 1985); United States v. Leighton, 265 F. Supp. 27, 35 (S.D.N.Y. 1968).

For this reason, a bill of particulars generally is not required where the information sought by the defense is readily accessible in some acceptable, alternative form. United States v. Bortnovksy, 820 F.2d 572, 574 (2d Cir. 1987); see also United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984) (no bill of particulars required where indictment spelled out defendants'

14

conduct in scheme, prosecutor met with defense counsel and explained government's

contentions, and provided defense with copies of all relevant documents); United States v. Ruiz,

702 F. Supp. 1066, 1070-71 (S.D.N.Y. 1989) (denying bill of particulars where indictment is

specific, defendant had adequate discovery and time to prepare, and there had been meetings

between defense counsel and counsel for the government); United States v. Shoher, 555 F. Supp.

346, 349 (S.D.N.Y. 1983) ("the complexity of the offense, the clarity of the indictment, and the

degree of discovery otherwise available to the defendants are all relevant factors to consider").

Furthermore, a bill of particulars is not to be used to learn: evidentiary detail, Torres, 901

F.2d at 234; the precise manner in which the charged crimes were committed, United States v.

Andrews, 381 F.2d 377, 378 (2d Cir. 1967); the manner in which the Government will prove the

charges, United States v. Leonelli, 428 F. Supp. at 882; all the overt acts in furtherance of a

conspiracy, United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975); or particular acts that a

particular defendant participated in, had knowledge of, or for which he is being held responsible,

United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993).

The rationale for this highly restricted use of a bill of particulars is simple. First, the

Government is not required to provide information tantamount to an itemized preview of its

proof because of the very real danger in criminal cases that the defendant will tailor his testimony

to explain away the Government's predisclosed case or will intimidate witnesses. United States

v. Sindone, 2002 WL 48602 at *1 (citing United States v. Cimino, 31 F.R.D. 277, 279 (S.D.N.Y.

1962)). Second, detailed inquiries into the Government's case repeatedly have been rejected

because they would unduly restrict the Government in presenting its proof at trial. See, e.g.,

United States v. Jimenez, 824 F. Supp. at 363; United States v. Goldman, 439 F. Supp. 352

15

(S.D.N.Y. 1977).

**B.    Discussion**

Al Kassar is charged in a clearly-worded Indictment detailing the charges that he faces. There can be no contention that the Indictment fails to sufficiently apprise him of the charges so that he can prepare a defense. Moreover, the Indictment includes 58 overt acts that describe in detail steps taken by al Kassar and his co-defendants in furtherance of the charged conspiracies. In light of the level of detail already provided by the Government in the Indictment, al Kassar cannot seriously contend that there is a risk of unfair surprise at trial.

The Government also has produced extensive discovery, including: (1) audio recordings of telephone and in-person conversations between al Kassar, his co-defendants, and the confidential sources; (2) video recordings of meetings between the defendants and the sources; (3) e-mails involving the defendants; (4) electronic copies of all evidence seized from the arrest of the defendants and the search of al Kassar's Marbella residence; and (5) DEA Form 6 Reports detailing all of the meetings between the defendants and the sources, the seizure of evidence, the arrest of the defendants, and their post-arrest statements. See N18–22, N27–28, N33–34, N37, N41–44, N46, N59–60, N63–64, N66–70, N72-73, N75, N77–79, N82–83, N85–88, N90–91, and N94; N45, N47, and N80; control numbers 203-1531; N97 and N98; and control numbers 162-202, 1902-1914, 1916-1934, 10000-10015, and DEA Reports of Investigation dated February 14, 2007, March 12, 2007, August 1, 2007, and September 10, 2007. Once again, based on the voluminous disclosures made to date by the Government, al Kassar is hard-pressed to establish either that he is uncertain of the nature of the charges against him or that he will be surprised at trial.

Notwithstanding the foregoing, the Government agrees to identify known accomplices and to describe their roles in the charged conspiracies, which directly addresses al Kassar's sixth request for particularization. The Government will provide such information to the defendants under separate cover. With respect to al Kassar's first, second, third, fourth, fifth, and eighth request for particularization, which essentially request details of the Government's predisposition evidence, the Government agrees to provide notice of its predisposition evidence four weeks before trial. With respect to al Kassar's seventh request regarding any additional overt acts evidence, the Government respectfully refers the defendants to the discovery previously produced. In light of these disclosures, the Government submits that al Kassar's motion for a bill of particulars should be denied.

## IV.    THE MOTION TO COMPEL THE GOVERNMENT TO IDENTIFY AND PRODUCE ITS CONFIDENTIAL SOURCES

Al Kassar also moves to compel the Government to identify immediately all of the confidential sources referenced in the Government's extradition affidavits. Al Kassar claims that because the Government's sources could potentially have relevant information regarding the defendants' possible entrapment defense, the Government is required to identify immediately all of the sources and produce them for pretrial interviews. For the reasons stated below, al Kassar's motion should be denied.

### A.    Applicable Law

The "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" United States v. Shamsideen, 2004 WL

17

1179305, *11 (S.D.N.Y. March 31, 2004) (citing <u>Roviaro</u> v. <u>United States</u>, 353 U.S. 53, 59

(1957), and <u>United States</u> v. <u>Jackson</u>, 345 F.3d 59, 69 (2d Cir. 2003)).  To overcome the

qualified privilege against disclosure – often referred to as the informant's privilege – "[t]he

defendant bears the burden of showing the need for a disclosure of an informant's identity, and to

do so must establish that, absent such disclosure, he will be deprived of his right of a fair trial."

<u>United States</u> v. <u>Fields,</u> 113 F.3d 313, 324 (2d Cir. 1997).

 It is not enough for the defendant simply to show that the informant was a participant in

and witness to the crime charged.  <u>United States</u> v. <u>Saa</u>, 859 F.2d 1067, 1073 (2d Cir. 1988)

(citing <u>United States</u> v. <u>Jiminez</u>, 789 F.2d 167, 170 (2d Cir. 1986)); <u>United States</u> v. <u>Brunson</u>,

No. 97 Cr. 398 (RSP), 1998 WL 146271, *2 (N.D.N.Y. Mar. 26, 1998); <u>United States</u> v. <u>Castro</u>,

No. 94 Cr. 809 (JFK), 1995 WL 6235, *2 (S.D.N.Y. Jan. 6, 1995).  Nor can a defendant meet his

burden by speculating on the Government's case against the defendant, or the informant's role

therein.  <u>United States</u> v. <u>Fields</u>, 113 F.3d at 324 ("Speculation that disclosure of the informant's

identity will be of assistance is not sufficient to meet the defendant's burden.").  Rather, the

defendant must make an affirmative showing that "the disclosure of an informant's identity . . . is

relevant and helpful to the defense of an accused, or is essential to the fair determination of a

cause," <u>United States</u> v. <u>Saa</u>, 859 F.2d at 1067, and that, accordingly, the need for disclosure of

an informant's identity outweighs the Government's interest in anonymity, <u>Shamsideen</u>, 2004

WL 1179305, at *11 (citing <u>Fields</u>, 113 F.3d at 324); <u>United States</u> v. <u>Jimenez</u>, 789 F.2d at 170

(disclosure not warranted where defendant produced no evidence that informant's testimony

"would have been of even marginal value to the defendant's case").

18

In Saa, which dealt with the Government's failure to disclose at trial the identity of an informant whom the Government did not call as a witness, the Second Circuit stated that there is a "'right . . . to information about an informant not merely so that the defense can call the informant to testify, but so that it can seek to interview him first.'" United States v. Palermo, 2001 WL 185132, *2 (S.D.N.Y. Feb. 26, 2001) (McKenna, J.) (quoting Saa, 859 F.2d at 1074). Since Saa, the Second Circuit and this Court have found disclosure at trial of the identity of informants, or the Government's production at trial of the informants for testimony, sufficient to permit a defendant to conduct a meaningful defense. See DiBlasio v. Keane, 932 F.2d 1038, 1043 (2d Cir. 1991) (permitting government to physically produce informant for testimony to address defendant's need to obtain informant's identity to prove entrapment defense); United States v. Jiminez, 824 F. Supp. 351, 365 (S.D.N.Y. 1993) ("Because, here, the informants' identities will be made available at trial, and the defendant will have ample opportunity at that point to attempt to interview the informants to determine whether to call them as defense witnesses, this part of the Saa holding [requiring disclosure of informant's identity] is inapposite."); United States v. Muyet, 945 F. Supp. 586, 602 n.16 (S.D.N.Y. 1996) (fact that Government would call informants to testify at trial, coupled with Government's production of impeachment material one week prior to testimony of each witness, allowed "the defendants to conduct a meaningful defense").

**B.     Discussion**

Under the applicable case law outlined above, al Kassar's motion for immediate disclosure of the identities and production of all the Government's confidential sources should be denied. With respect to the sources other than Samir, Carlos and Luis, al Kassar has failed to

19

make a showing that disclosure of these sources' identities would be relevant and material to the defendants' entrapment defense at trial. None of these sources had any involvement with the defendants in the FARC weapons deal at the heart of this case. Accordingly, al Kassar cannot demonstrate that any of these sources has information that would advance his entrapment defense. United States v. Jiminez, 824 F. Supp. at 365 (where defendants failed to make sufficient showing as to how informants' testimony would be material to their defense, Government's interest in protecting informants' safety outweighed need to learn informants' identities); United States v. Muyet, 945 F. Supp. at 602 (defendants' claim that informants would provide the only direct evidence in the case insufficient to require Government to make pretrial disclosure of informants' identities).

While the testimony of Samir, Carlos and Luis will likely be relevant and material to any entrapment defense, see DiBlasio v. Keane, 932 F.2d at 1043 (informant's testimony material where defendant raised entrapment defense involving narcotics transaction in which informant participated), that does not mean that the defendants are entitled to the relief they seek. The Government has already produced in discovery all recorded conversations involving these three confidential sources, as well as all DEA reports detailing these sources' interactions with the defendants both prior to and during the FARC weapons deal. More importantly, the Government intends to call both Samir and Carlos[4] as witnesses at trial, and agrees to produce all 18 U.S.C. § 3500 material two weeks prior to trial. As a result, immediate disclosure of these sources'

---

[4]    Luis was recently murdered at a location outside the United States, and thus, will obviously be unavailable to testify at trial.

20

identities is not required to ensure the defendants' right to a fair trial.  See DiBlasio, 932 F.2d at

1043; Jiminez, 824 F. Supp. at 365; United States v. Muyet, 945 F. Supp. at 602 n. 16.

## V.    THE MOTION FOR ADDITIONAL DISCOVERY SHOULD BE DENIED

Finally, al Kassar moves to compel the Government to produce the following additional

discovery pursuant to Rule 16: (1) recordings of meetings between Samir, Carlos, Luis and the

defendants on February 6-7, 2007; (2) recorded telephone conversations between al Kassar and

third parties; and (3) any notes of post-arrest conversations between the defendants and

Government agents.  (See al Kassar Br. at 16-17).  The materials sought by al Kassar either do

not exist, or have already been produced to him.

First, there are no recordings of the February 6-7, 2007, meetings.  These meetings

represented the first time that the DEA confidential sources entered al Kassar's Marbella

residence.  For security reasons, DEA agents did not provide Samir, Carlos or Luis with any

recording equipment for these early meetings.  The Government has previously produced,

however, a DEA report summarizing these meetings.  (See DEA Report of Investigation dated

February 14, 2007).  Second, the Government has previously produced all DEA recordings of

conversations in which al Kassar was a participant.  (See N18, N20–22, N27–28, N33–34, N37,

N43, N44–47, N59, N63–64, N66–67, N70, N73, N75, N79–80, N83, N85–86, N90–91, and

N94.).  These materials include all the recorded conversations between al Kassar and Samir,

Carlos and Luis relating to the FARC weapons deal.  Finally, the Government has previously

produced the post-arrest statements of al Ghazi and Moreno.  (See control numbers 1902-1914).

The Government recently produced the post-arrest statements of al Kassar.  (See control numbers

21

10009-10015).[5] Accordingly, al Kassar's motion for additional discovery should be denied as moot.

## VI.    CONCLUSION

For all of the reasons set forth above, al Kassar's motion to dismiss the Indictment, to compel the Government to provide a bill of particulars, to compel the Government to identify and produce its confidential informants, and to compel the Government to produce additional discovery should be denied.

Dated:  July 29, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    ~~BL M'G~~

BOYD M. JOHNSON III
LESLIE C. BROWN
BRENDAN R. MCGUIRE
Assistant United States Attorneys
(212) 637-2276/2638/2220

---

[5]    Because the Government produced al Kassar's post-arrest statements after the July 15, 2008, deadline for al Kassar's motions, the Government does not oppose a request by al Kassar to file an additional motion to suppress his statements.

22

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following

by U.S. mail and electronic mail on July 29, 2008:

Ira Lee Sorkin, Esq.
Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, New York 10036-2714
(212) 277-6500

Marc Agnifilo, Esq.
Brafman & Associates, P.C.
767 Third Avenue
New York, New York 10017
(212) 750-7800

Roger L. Stavis, Esq.
Gallet Dreyer & Berkey, LLP
845 Third Avenue, 8th Floor
New York, New York 10017
(212) 935-3131

Brendan R. McGuire